Case number 20-3264 AtriCure Inc v. Jian Meng et al. Argument not to exceed 15 minutes per side. Mr. Pucnes, you may proceed for the appellant. Thank you, Your Honor. May it please the court. In order to be justified for the extraordinary relief of a preliminary injunction, AtriCure had to do three things at the hearing. It had to identify what was provided to the defendants. It had to identify what was taken by the defendants. And then it had to show that what was provided and what was taken were, in fact, trade secrets. AtriCure failed on all three fronts. Let's start with access. The district court cited a few pieces of evidence to justify its finding of access, but none of them supported. In the finding of access, the district court cites a series of distribution agreements between AtriCure and various companies associated with Dr. Meng. But all those distribution agreements contain our standard NDA language saying that confidential information may be provided. If confidential information is provided, it's to remain confidential. There's nothing in those agreements that actually identifies what was provided to the defendants. Now, in order to fill that gap, AtriCure used the testimony of Douglas Seif. Now, he's the one who was cited in the district court order and testified that AtriCure gave the defendants everything about AtriCure's system. Soup to nuts is the quote that's so memorable from there. But on cross-examination, Mr. Seif admitted that he didn't really know what was provided to the defendants. And you can find the cross-examination page ID 1689 to 1693, including his admission that, quote, I'm not personally aware of the Dr. Meng. With regards specifically to the algorithm used in AtriCure's ablation and sensing unit, Mr. Seif testified that, quote, I can't say definitively for sure if it was, end quote, provided to Dr. Meng. So there's no evidence in the record that any confidential information was actually provided to the defendants. Now, with regard to the algorithm, the district court cited the testimony of Mr. Privatera, who's another AtriCure witness. But again, well, and even that site, though, at page ID 1839 to 1840, Mr. Privatera says nothing about the AtriCure algorithm actually being provided to Dr. Meng. What he talks about is how secret the algorithm is and how very few people outside the company even know about it. But what he did do was, just like Mr. Seif, he admitted that he had no knowledge of what was actually provided to the defendants in the case. And you can get that admission page ID 1848 to 1849. So after all of this talk about soup to nuts being provided, there are only two items of information that remain that were provided to Dr. Meng and Mr. Seif talks about instructions for use. But it's clear from his testimony that the instructions for use are public information. They're the instructions that are provided to the hospital, to the doctors in order to use these publicly available products. And in any event, there's nothing in the record that the actual document instructions for use appears nowhere in the record. So there's no support for a trade secret finding with regard to that. Mr. Pugnese, could I interrupt you to just ask more of a threshold question? This is coming to us, is it not, in connection with the preliminary injunction that's issued by the district court? It is, your honor. So you haven't gotten to the merits? Well, it has to show a likelihood of success. I understand it's one of the elements of preliminary injunction, but there'll be a merits trial at some point, presumably, right? At some point there will be, but there needs to be. I'm just wondering if our assessment of, I'll call it for lack of a better word or phrase, sort of the quantum of evidence that you're ably talking about here, both about the identification of what was a trade secret and the evidence that that trade secret was actually conveyed. Do we evaluate that any differently in light of this being a preliminary injunction phase than perhaps the standard that would apply upon review of a jury verdict at the end of the case? Well, certainly you don't engage in balancing of evidence, weight of the evidence kind of issues, and you wouldn't do that in reviewing a jury trial at all. But there needs to be some evidence supporting the finding of likelihood of success. There has to be something in there that at trial, when this evidence is shown to a jury, that there's a likelihood that the jury will find for the plaintiff in the case. So it's not just a, trust me, your honor, by the time we get to trial, we'll be able to support this. They need to provide at least the quantum of evidence that would suffice for a jury that would be likely to be accepted by a jury at trial. And we'd say that none of the evidence that the district court cited would qualify under that standard. There's no indication of a likelihood of success at trial here. With regard to use, let me back up. There was one other item that I think you could, the record would show was provided to the defendants, and that's an actual sample of the clip. Now the sample is publicly sold. The sample is sold to hospitals, sold to doctors. So the clip itself cannot qualify as a trade secret. And any information that you would get from reverse engineering the clip can't qualify as a matter of law as a trade secret, which gets us to the district court's findings of use. Those findings are just as unsupported as its findings on access. So on the use side, the district court cites testimony from Attracure's witnesses, where they say they heard Dr. Mung confess to entering into competition with Attracure, and even going so far as saying that Dr. Mung confessed to copying their clip and copying their clamps. But again, these are publicly available products. So they themselves can't qualify as trade secrets. But when the district court justifies its finding of use, it talks about conspicuous similarities, that's a quote from the district court's order, that were apparent by quote, visual examination. Well, those kinds of things as a matter of law can't justify a finding of likelihood of success on trade secret misappropriation. So didn't your client receive technical documents that were needed to obtain permission from the Chinese government? That was Mr. Seitz's testimony, where he said in order to get the China FDA approval for these products, they had to be provided documentation. But then Mr. Seitz admitted that he didn't know what the China FDA requirements actually were, and what was actually provided to the defendants. So the question is, is there any evidence in the record showing that the defendants received confidential trade secret documents, and there's nothing in the record that would support that. But they acknowledged that they did, right? Your Honor, they didn't. There was no testimony either way, from Dr. Mung about what they Don't they acknowledge receipt of confidential information? The only information where you could get that from is in the distribution agreements, which acknowledge that confidential information may be provided, and that any confidential information provided needs to be protected. But there's no admission from anywhere in the specific confidential information. There's just inferences from the relationship, but then when it actually came time to prove it, they failed to carry that proof. And do you have any position on the extraterritorial application? I do. I do, Your Honor. And what we say here is that district court just didn't have the authority to enjoin activity in China. And the place to start is with the Steele versus Bulova case from the Supreme Court, which recognizes as a general proposition that we presume laws don't have an extraterritorial effect. Here we're dealing with Ohio's Uniform Trade Secret Act, and there's nothing in the act itself that suggests that Ohio legislature wanted these laws to apply extraterritorially. But Ohio doesn't have that blanket rule of no extraterritorial application unless explicit. Well, Your Honor, that's a general rule that most states follow. And I have a case from the Ohio Supreme Court, Stetson versus Citibank of New Orleans to Ohio 167 at 174. And it talks about the presumption the legislature having no extraterritorial power must be presumed to intend to confine their operation to institutions within its jurisdiction. So this is a general rule of applicability. It applies generally. And there's no indication, you know, even if you don't have a presumption in there's no indication that they intended the law to apply overseas. What kind of protection would this statute actually provide? Well, and if you look at the commentary surrounding the Federal Trade Secrets Act, Your Honor, you'll see that the Congress recognized that the state laws were limited in how they could address commerce, especially in the international world. So there is an avenue for them to go in the Federal Trade Secret Act. In fact, the Motorola case found that the Federal Act did have extraterritorial effect. But just to summarize, the test the court should have applied is in Vanity Fair Mills versus Eaton, where it talks about a three-factor test where you take into account the citizenship of the defendants, the effect on commerce in the with foreign laws. And if the court had applied that standard, it would have recognized that an injunction in China is improper. There's no question that the defendants are Chinese citizens, Chinese corporation. Now it's interesting, Attracure says the district court found... I'd like to go back to Judge White's question because it seems to me you still haven't answered it. If you've got an Ohio statute that protects trade secrets, somebody allegedly steals those and they're going to be used in China, it seems just logically 101 that if your client can then make sales of this product that's derived from using stolen trade secrets, that the plaintiff is not going to be able to make those sales. So the effect of this might be occurring in China, but it's also going to have an adverse impact on the plaintiff in Ohio. So what's the point of the statute if you can steal trade secrets but use them someplace else and a court can enjoin that? Well, I see I'm out of time, but obviously you may answer should answer the question. So the point of the statute, if you look at the cases that are cited in the party's briefs where there was injunctions on overseas activity in certain circumstances where, for example, the theft occurred in the United States, the defendant came to the United States or has a presence in the United States, those kinds of things, those are all taken into account by the test, by the Vanity Fair Mills test. But here you have an American company going to China, signing a contract with a Chinese company that has Chinese choice of law, Chinese arbitration provisions. Everything occurs in China. And so I'm not saying that a Chinese company can never be enjoined by a United States court, but you need to look at the factors that the precedent sets out. And here all the factors that would point to extraterritorial jurisdiction are missing. Wasn't there evidence that your client actually came to the States to solicit to be the agent in China? There were two trips to Ohio that were not in connection with soliciting business. It was part of just the business relationship that had already been established in China. But those kinds of concerns would go to personal jurisdiction. And we're not talking about personal jurisdiction issue. In fact, the Vanity Fair court noted that there was personal jurisdiction over the defendant, but still extending U.S. law into Canada under those circumstances were improper. So there is some, Attracur exaggerates the contacts with Ohio, but even if there is personal jurisdiction, which we contest, but not on this appeal, it would not allow the court to extend its jurisdiction into China. Okay. Thank you, Mr. Putness. You will have your three minutes of rebuttal. Thank you. Thank you. Mr. Nadeau. Good afternoon. May it please the court, Chief Judge Cole, Judge McKee, Judge White. My name is Martin Nadeau and together with my colleague, Cameron Fine, we appear in the appellate court on behalf of Attracur. We propose to address three issues today. One, trade secrets, do they exist here? Two, were they misappropriated? And three, whether the scope of the injunctions appropriate. As I commence, let me observe that the characterization of the facts that was just relayed to you is, as you will appreciate from our point of view, inaccurate. And it doesn't fully take into account statements made in the orders of the court or the evidence below. The Sixth Circuit, with respect to the stay motions, found that that same problem existed in earlier papers filed by Meng and Medzinev. Turning to the question of whether there are trade secrets here, it's apparent these are the kinds of things that are often found in the order. If you look at page 11 of the judge's order, you will find that he found, as a matter of fact, and Judge McKee, this goes to your question about the standard of review, he found A, that drawings were delivered. He found that manufacturing specifications were delivered. He found that specs for the kinds of materials to be used in the product were delivered. He found that pricing was delivered and known by Medzinev. Vendors were identified as well. The algorithm was mentioned. And, of course, within the context of the opinion as a whole, there's the electrodes and issues found within the product. So, what are we dealing with here? I mean, I understand that. We've read the order too. But I thought the crux of the argument here is that those findings by Judge Barrett were not supported by the evidence in the case. Isn't that the issue? First, the issue is whether there's abuse or clear error or mistake. And it would be very difficult to come to that conclusion with this kind of hearing. More to the point, however, my colleague focused on one set of testimony but didn't go into the other six witnesses at any length. But with respect to access, which comes up with misappropriation but also goes to the trade secrets, he came to Ohio. He visited the factory in Mason, Ohio. He was provided with inside information on the construction of the product and how it was produced and quality controls and all of that. And he did it on more than two occasions. His national sales manager is based in Minneapolis, Minnesota. So, when you talk what's in the record, Sam Prevatera testified for a number of hours. Then we had an actual demonstration of the product in which Prevatera and the nurse were subjected to cross-examination at that time to show how it worked and the lesions that could be put on human heart tissue, which you'll appreciate comes in different fatty conglomerations of tissue. So, how this medical device works is very high-end. It's in open heart surgery and in an ablation mode where you're putting lesions and or burns on skin and creating scars so that the improper electrical impulses don't travel. Mr. Nadeau, I guess going to questions of both Judges McKeague and White, and I see Judge White has a question. So, I understand there was observation of how the product operated and a fair amount of consultation and discussion between the various parties here, but how would the algorithm have been delivered, let's say, to Mr. Mung or MedZenith or one of these other entities? That would not be apparent from observation or just discussions, would it? So, is there evidence in the record that the algorithm was delivered? We do not have all of the evidence because of Judge McKeague pointed out we're at the preliminary injunction stage, and of course, we had no disclosure or evidence provided until the day of trial in the form of affidavits, and Mr. Mung himself decided not to appear whatsoever, virtually or otherwise. But to your point, the algorithm is contained in a unit that is used in coupling with the clamps and other devices to accomplish the ablation. Now, the algorithm provides literally real-time feedback on the depth of the scarring that's placed on the heart such that a tone is eliminated, is set forth to alert the surgeon when to stop using the clamp. Now, what MedZenith has done is it tried apparently to produce the power unit and the algorithm. It says, we don't know this, with a manufacturing unit separate from itself in Shanghai. They were not, it seems, able to come up with it. We don't know this for sure, but they came up with an adapter so that they could try to plug in, if you will, to the algorithm with the clamp that they produced. Two or three critical issues here. One, no testing of that to make sure that that adapter does anything with the clamp at all. You have testimony in the record about deviations in power or millimeters. One one thousandth of an inch on the clamps can be misread by the algorithm, and that's why it's all working as a unit. But they try to, in this circumstance I suggest to you, steal the algorithm by getting an adapter, plugging into Atricure's machines, and trying to get that to marry up with their clamp or pen or whatever other Atricure product they've copied. But that's a question of use in your misappropriations claim. Doesn't the fact that they couldn't make their own unit work and they had to use this adapter suggest, as Judge Cole is asking you, that they didn't get the algorithm? It may. You're correct. We don't know all the facts just yet, but it may suggest that, that they don't have the algorithm. But they are definitely trying to misappropriate and steal, as you suggest, that trade secret in its substance and value from the machine. But that doesn't take away the notion that the other medical devices, functional medical devices, have been copied here. And the judge found that they were in fact copied. So we have drawings that have actual specifications down to millimeters on the depth of the trench in the metal, what kind of electrodes will be used, how all of this will work, all being delivered to Munk. So now my opponent argues, well, how does he get access? Well, we've already talked about, I mean, common sense would have to be left at the door for any court to conclude he didn't get access. He came to Ohio a number of times, went to the factory. He got the drawings, as Judge White points out, and the judge found, in order to get licensures. Licensures which, by the way, he diverted to himself at first. Then he gets them in China. We have, as my opponent says, confessions. We call those admissions. He said he copied it. That's important. If he's in Amsterdam and he's confronted with a clamp produced by his sham corporation, MedZenith, supposedly innovating in China, an ablation device, and he says, we copied it. That tells you he didn't just get it through reverse engineering. That was testimony that was put on. Mr. Munk chose, as I said earlier, not to appear and testify. There were others in the rooms, both there and in Houston and Beijing. There were even lawyers in the room in Beijing at the meetings who told the Atricure personnel that it was copied. Now, again, we're not addressing here, or in your opening by my in Beijing, and what was said. Mr. Joe, the problem with this is the at least arguable superficial analysis made by the district judge in this case. Somebody says they copied. Well, you can copy things without violating a trade secret. I'm not sure where that gets you. It just seemed like reading what all of your witnesses said, none of them said, well, he must have gotten trade secrets, but they couldn't identify what the trade secret was. I'm just telling you as the prelude to my second question, what I'm concerned about in terms of the question of trade secrets. I'm just wondering if you prevail on the misappropriation of a trade secret as opposed to the theft of the trade secret. I understand, although I'm not sure that I fully understand. I think those are two different things. Then are you still entitled to the preliminary injunction you got if you lose on the first one and you went on the second one? Absolutely, we're entitled, but as to the first point, look to the cases out of this circuit with respect to Handel, Heartland, also look at the Lionel Trains case. The fact that you can find a trade secret that is out in the public domain, the fact that you can see parts of it, says Judge Easterbrook in IDX, doesn't mean there's no trade secret there. He didn't find there was no trade secret in the algorithm. He said it hadn't been explained. I think that's all true, but I just want to ask you the obvious question that's on my mind, and that is, why didn't you have one single witness that could testify as to a specific item that was a trade secret? I believe we did. Other than making general secrets about, we told them everything, we gave them soup to nuts, we let them see how it works, which witness should we look at that identifies a specific trade secret other than the algorithm? I would tell you, please do look at the tariff and look at the testimony of the CEO, Mr. Carroll. What specific trade secret? Just give me two examples. Design drawings. If you look at that alone, if you find that the judge didn't have a clear error of fact and didn't manifest injustice, if he didn't abuse his discretion in these findings, and if you find that he said there was testimony presented to him of drawings... Take a breath. Your products are patented in the United States, right? In part, that's true. There are figures and drawings in patents, so are you contending that he was given drawings that had trade secrets beyond what was in a patent? Yes, because you don't have to in patents disclose all of the various materials involved, nor the amount of power. Remember, these are radio frequency. You can characterize it as being radio frequency. You can characterize electrodes. You can characterize the object of the game, if you will, but a patent doesn't supply you with everything necessary, because if that were so, then every patent filed in the United States would lead to the disclosure of every medical device Medtronic or anybody else produces, and that is not the case. So where we're at is we have on page 11 a judge who finds drawings went, specifications went, materials went, vendors went. You know that the distributor had access to pricing and to customers and all of that, which courts have repeatedly found leads to irreparable harm, and here we haven't even paused on the equities. The equities are substantially in favor of HRQ here. Scope, we're down to the last seconds, but there are many cases that do reach beyond the boundaries of the United States with injunctions and do so in an appropriate case. Here we have someone who's been in the United States a lot. You know this from the AGA case. This person has had an approach and a plan, which is to this court found that he was copying each and every one of HRQ's products. That took years and years to develop and millions of dollars. You cannot find that that is credible, and the judge found it incredible. We thank you. Thank you, Mr. Nadeau. I hate to cut you off, but your time has expired. Thank you. Mr. Puckness, you have three minutes of rebuttal. Thank you, Your Honor. Just a few things. HRQ's counsel cited page 11 of the district court's order. When you look at the support there on page 11, px 78 paragraph 18, that's Mr. Seitz's declaration, and if you go to the cross-examination I referred to, page id 1689 to 1693, every single one of the specifics discussed on that page are disclaimed by Mr. Seitz. He disclaims any knowledge that any of that was provided. There was talk of Mr. Privatera. Mr. Privatera also admitted that he didn't provide them with anything, and he wouldn't speculate on what was provided to them. Page id 1848, 1849, no other witness testified about what was provided to them. All the other witnesses just talked about superficial similarities between the products. Mr. Nadeau talked about the adapter issue, that they stole the algorithm using the adapter. We've challenged them several times to cite a single case that shows making an adapter for a publicly available product is trade secret misappropriation, and they've not even attempted to do that. Mr. Nadeau talked about design drawings, quote, down to the millimeter. There's no evidence of that in the record. That's just statement of counsel. There's no citation to the record provided with it, and there's nothing in the record that would support it. No evidence were provided with design drawings? Design? Well, the question is, well, there's no evidence they were provided design drawings, which gets me to the other, you know, that it's common sense that confidential information would be given to these guys to get China FDA approval. It's not common sense. I mean, it's what you provide to a public agency becomes public knowledge unless it's protected, you know, the China FDA procedures. I know about the FDA procedures a little bit, and, you know, you have to be careful about what you provided, so it's not obvious. It's not common sense that confidential information necessarily would be given. They have to prove it, and they didn't. Finally, the idea that a publicly available product can still have trade secrets, that's refuted. This court's decision in tri-state plastic molding, Jocano versus Invacare, these cases are, Legion, they're cited in our briefs, that as soon as it hits the shelves, nothing that can be reversed engineered in those products can qualify as a trade secret. Unless you have any more questions, Your Honor, I think we can put this under advisement. Okay. Thank you, counsel, both of you, for your arguments this afternoon. We